907 So.2d 1203 (2005)
DSL INTERNET CORPORATION, Appellant,
v.
TIGERDIRECT, INC., Appellee.
No. 3D04-0145.
District Court of Appeal of Florida, Third District.
June 8, 2005.
Rehearing Denied August 17, 2005.
*1204 Borgognoni, Gutierrez & Arza, and Gregory P. Borgognoni, for appellant.
Holland & Knight, and Lucinda A. Hofmann, Miami, and William F. Hamilton, Tampa, and J. Brett Grosko, Miami, for appellee.
Before GREEN and RAMIREZ, JJ., and SCHWARTZ, Senior Judge.
RAMIREZ, J.
DSL Internet Corporation appeals the trial court's final judgment entered in favor of defendant TigerDirect, Inc., ratifying and approving the General Master's report. We affirm because the General Master's findings and conclusions are supported by competent and substantial evidence in the record concerning the parties' intentions when they entered into the subject marketing agreements.
DSL is an internet service provider that sells high speed digital subscriber line services to companies and individuals. TigerDirect is a corporation that markets goods and services provided by others in exchange for commission payments to TigerDirect. TigerDirect's services offered to DSL included the placement of DSL's information on TigerDirect's website and DSL's ads in TigerDirect's catalogs. During the parties' business relationship, TigerDirect provided DSL advanced drafts of the ads to be placed in the catalog issues and on the website, and DSL would approve the placement and format. TigerDirect placed the DSL advertisements in its catalogs and website pursuant to various agreements, two of which were written agreements entered into in August and October of 2000 that contained a specific duration period.
Mario Bustamante, DSL's President and CEO, actively participated with Kevin Hamann, TigerDirect's Marketing Manager, in initial contract negotiations. Demitrio Rico, DSL's Sales Vice-President, actively participated in subsequent contract negotiations, and Bruce Matthews, TigerDirect's Vice-President of Business Development, similarly participated in contract negotiations. At issue in this case is the amount DSL owes TigerDirect under a written agreement entered into in January of 2001 which Hamann negotiated with Rico. In this agreement, TigerDirect agreed to include a full-page advertisement in its catalog "Issue 02-04, 2001" and on its website. The agreement lists various conditions, including $15,000.00 as the minimum guaranteed revenue.
The General Master issued his Report and Recommendation in favor of TigerDirect in the amount of $15,210.00, plus interest and an award of attorney's fees. The General Master determined that DSL's minimum payment obligation under the January 2001 agreement covered a period of three months and required a minimum payment of $36,000.00. The General Master found that the terms of the agreements were ambiguous with respect to DSL's minimum guaranteed payment, but found that the general rule *1205 which requires that contracts be construed in favor of the non-drafter did not apply because the individuals who negotiated the agreements were sophisticated parties.
We find that there is competent substantial evidence to support the General Master's finding that the January 2001 agreement covered three months, February through April 2001, and required DSL to compensate TigerDirect in excess of $15,000.00. Florida law requires that a contract be interpreted against the drafter when the contract contains ambiguous terms. See Excelsior Ins. Co. v. Pomona Park Bar & Package Store, 369 So.2d 938, 942 (Fla.1979). The construction-against-the-drafter principle is a rule of last resort and is inapplicable when there is evidence of the parties' intent at the time they entered into the contract. See Child v. Child, 474 So.2d 299 (Fla. 3d DCA 1985). See also The School Bd. v. Great Am. Ins. Co., 807 So.2d 750, 752 (Fla. 4th DCA 2002). Parol evidence is admissible to determine the meaning of ambiguous terms through the parties' own statements and conduct. See Berry v. Teves, 752 So.2d 112, 114 (Fla. 2d DCA 2000); First Capital Income and Growth Funds, Ltd.  Series XII v. Baumann, 616 So.2d 163, 165 (Fla. 3d DCA 1993).
We agree with the General Master that the January 2001 agreement contains an ambiguous term. However, when the parol evidence is viewed in its entirety, we determine that there was competent substantial evidence of what the parties intended when they entered into the January 2001 agreement. We thus do not agree with DSL that the January 2001 agreement should have been construed against TigerDirect as the drafter, and find insufficient evidence to support DSL's interpretation of the nature of the January 2001 agreement and the amount DSL is obligated to pay under that agreement.
We first turn to the phrase "02-04" contained in the January 2001 agreement. There is no competent substantial evidence that the phrase "02-04" contained in the January 2001 agreement meant "February 4th" and was not intended to cover a series of months. There is likewise no competent substantial evidence that TigerDirect believed the maximum amount DSL owed TigerDirect was the minimum payment provided for in the agreement or $15,000.00.
Todd Lee, TigerDirect's Director of Information Systems, never testified that the phrase "02-04" in the January 2001 meant "February 4th." Lee instead testified that TigerDirect's computer system generates reports with "six-position" dates and that the system stores "February 4th" as "02-04." He also testified as to the phrase "02-04" within the context of an invoice that DSL produced whose date did not coincide with TigerDirect's computer system method of printing dates, and not within the context of the January 2001 agreement.
Furthermore, neither the August nor the October 2000 agreements of the parties referred to any specific month and day on which TigerDirect was to publish any catalog. Although Matthews agreed that it was possible that Bustamante might not have been clear on the scope of the agreement, Matthews did not actually prepare the January 2001 agreement. Hamann, who did prepare the January 2001 agreement, testified that there was no confusion on the part of DSL as far as what the January agreement meant. Hamann further testified that Rico always understood that the agreement was to cover February, March, and April of the year 2001. Additionally, Hamann wrote to Bustamante on February 8, 2001 to inform Bustamante *1206 that DSL would be taken out of Issue 03 if DSL did not pay its outstanding debt. Hamann provided Rico with advertisement proofs of Issue 03, and Rico approved them.
Bustamante was very well aware that TigerDirect normally charged $15,000.00 per catalog issue and he understood that TigerDirect's cost to cover was $15,000.00. Bustamante admitted that TigerDirect told him during negotiations that DSL could obtain a page in the catalog for $15,000.00. Although Matthews testified that he was unaware of any amounts DSL owed TigerDirect other than the minimum due under the parties' agreement, he also testified that if DSL sold more accounts or owed TigerDirect more money, then there would be more money owed to TigerDirect. Hamann testified that the parties always understood that TigerDirect's cost to cover their catalog and the catalog's partner page was $15,000.00, and that $15,000.00 was the minimum guaranteed revenue owed to TigerDirect.
For these reasons, we conclude that the trial court did not err in its entry of judgment in accordance with the Amended Report of the General Master entered in favor of TigerDirect.
Affirmed.